William HIBBS, Plaintiff–Appellant,

United States of America, Intervenor,

v.

DEPARTMENT OF HUMAN RE-SOURCES; Charlotte Crawford; Nikki Firpo, Defendants–Appellees.

No. 99–16321.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 9, 2001

Submission Vacated April 10, 2001

Resubmitted May 1, 2001

Filed Dec. 11, 2001

Treva J. Hearne, Reno, Nevada, for the plaintiff-appellant.

Peter J. Smith, Civil Division, U.S. Department of Justice, Washington, D.C., for the intervenor.

Charles Hilsabeck, Deputy Attorney General, Reno, Nevada, for defendants-appellees.

Before: REINHARDT, TASHIMA,* and BERZON, Circuit Judges.

TASHIMA, Circuit Judge:

William Hibbs brought suit in district court against the Nevada Department of Human Resources, its director, Charlotte Crawford, and Hibbs' supervisor, Nikki Firpo (collectively "Defendants"), for violations of the Family and Medical Leave Act of 1993 ( "FMLA"), 29 U.S.C. §§ 2601–2654, and 42 U.S.C. § 1983 and the Fourteenth Amendment, as well as various state-law claims. He timely appeals the district court's grant of Defendants' motion for summary judgment on his federal claims and the dismissal without prejudice of his state-law claims. We have jurisdiction under 28 U.S.C. § 1291, and we reverse.

## I. BACKGROUND

Hibbs was an employee of the Nevada Department of Human Resources, Welfare Division (the "Welfare Division"). In April and May 1997, he requested leave to care for his ailing wife. His request was approved for the full 480 hours (12 weeks) of leave under the FMLA, to be used intermittently, as needed, between May 1, 1997, and December 31, 1997.

In June 1997, Hibbs requested 379.8 hours of "catastrophic leave," and he was granted 200 hours of such leave. He was informed that the leave would "be counted

---

* Except for Part III.A.3.e, which was authored by Judge Berzon.

against [his] annual FMLA leave entitlement." In September 1997, Hibbs requested an additional 179.8 hours of catastrophic leave, and he was granted 180 hours of such leave.

The last day that Hibbs went to work was August 5, 1997; before then, he had already been using his leave time intermittently, as approved. In October 1997, the Welfare Division informed Hibbs that he had exhausted his 12 weeks of FMLA leave. Hibbs requested 200 more hours of catastrophic leave, but his request appears not to have been approved.[1]

By a hand-delivered letter of November 6, 1997, the Welfare Division informed Hibbs that no further leave time would be approved and that he was to report to work on November 12, 1997, or face disciplinary action. When Hibbs failed to report to work and did not call in to explain his absence, he was given a written reprimand in which the Welfare Division ordered him to report to work immediately or face "further disciplinary action up to and including termination."

On December 8, 1997, Hibbs was given a written "Specificity of Charges," which described the disciplinary charges against him, stated that the recommended disciplinary action was dismissal, and informed him that a predisciplinary hearing was scheduled. Hibbs appeared at the hearing, which took place on December 19, 1997; he was not represented by counsel at the hearing, but he had consulted with an attorney beforehand. Hibbs argued that the Welfare Division was misapplying the FMLA and that his unpaid FMLA leave should begin to run after his paid catastrophic leave ended, not concurrently with it. The hearing officer recommended Hibbs' dismissal. Effective December 22,

1997, Hibbs' employment with the Welfare Division was terminated.

On January 7, 1998, Hibbs filed a grievance with the Welfare Division. The grievance was rejected because the grievance procedure is available only to employees and, by then, Hibbs was no longer employed by the Welfare Division. Construing the grievance as an appeal of the decision of the predisciplinary hearing, the Welfare Division forwarded it to the Nevada Department of Personnel. The Nevada Personnel Commission dismissed the appeal with prejudice as untimely.

Hibbs then brought suit in federal district court against Defendants. He sought damages and injunctive and declaratory relief for violations of the FMLA and the Due Process Clause of the Fourteenth Amendment, as well as on several state-law grounds. On Defendants' motion for summary judgment, the district court concluded that the FMLA claim was barred by Nevada's Eleventh Amendment immunity and that Hibbs' Fourteenth Amendment rights had not been violated. Having granted summary judgment on the federal claims, the district court declined to exercise supplemental jurisdiction over the state-law claims and dismissed them without prejudice to their being pursued in state court. This timely appeal followed. On appeal, the United States has intervened to defend the validity of the FMLA's application to the states.

## II. STANDARD OF REVIEW

■ We review the district court's grant of summary judgment de novo. *Weiner v. San Diego County*, 210 F.3d 1025, 1028 (9th Cir.2000). The issue of whether a party is immune from suit under the Elev-

---

1. Hibbs claims that the request was approved, but his citations to the Excerpts of Record provide no support for the claim.

enth Amendment is reviewed de novo. *Sofamor Danek Group, Inc. v. Brown*, 124 F.3d 1179, 1183 n. 2 (9th Cir.1997); *Harrison v. Hickel*, 6 F.3d 1347, 1352 (9th Cir. 1993).

## III. DISCUSSION

### A. Eleventh Amendment Immunity and the FMLA

■ "Under the Eleventh Amendment, a state is immune from suit under state or federal law by private parties in federal court absent a valid abrogation of that immunity or an express waiver by the state." *Mitchell v. Franchise Tax Bd. (In re Mitchell)*, 209 F.3d 1111, 1115–16 (9th Cir.2000) (citing *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 669–70, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999); *Seminole Tribe v. Florida*, 517 U.S. 44, 64–68, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)). The same immunity also applies to state agencies. *Fla. Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 684, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982).

■ Congress can abrogate state sovereign immunity if it both (1) unequivocally expresses its intent to do so, and (2) acts pursuant to a valid exercise of power. *Seminole Tribe*, 517 U.S. at 55, 116 S.Ct. 1114 (citing *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985)). Congress cannot abrogate state sovereign immunity by means of its Article I powers. *Id.* at 72–73, 106 S.Ct. 423. It can, however, abrogate state sovereign immunity by means of its enforcement power

under section 5 of the Fourteenth Amendment. *Bd. of Trustees of the Univ. v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 962, 148 L.Ed.2d 866 (2001); *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 80, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000).

There is no case law in our circuit on the validity under the Eleventh Amendment of private FMLA suits against the states.[2] Seven other circuits have held that the FMLA was not enacted pursuant to a valid exercise of Congress' section 5 power. *Laro v. New Hampshire*, 259 F.3d 1, 11 (1st Cir.2001); *Townsel v. Missouri*, 233 F.3d 1094, 1096 (8th Cir.2000); *Chittister v. Dep't of Cmty. & Econ. Dev.*, 226 F.3d 223, 229 (3d Cir.2000); *Kazmier v. Widmann*, 225 F.3d 519, 526, 529 (5th Cir. 2000); *Sims v. Univ. of Cincinnati*, 219 F.3d 559, 566 (6th Cir.2000); *Hale v. Mann*, 219 F.3d 61, 69 (2d Cir.2000); *Garrett v. Univ. of Ala. at Birmingham Bd. of Trustees*, 193 F.3d 1214, 1220 (11th Cir. 1999), *rev'd on other grounds*, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). However, only *Kazmier* expressly involves the FMLA provision at issue in Hibbs' case, namely, § 2612(a)(1)(C), which provides for leave to care for a sick family member. *See Kazmier*, 225 F.3d at 525–26. The other cases either fail to state which provision of the FMLA is at issue or involve only § 2612(a)(1)(D), which provides for ordinary sick leave (i.e., leave occasioned by the employee's own illness). *See Laro*, 259 F.3d at 11; *Townsel*, 233 F.3d at 1095–96; *Chittister*, 226 F.3d at 225; *Sims*, 219 F.3d at 560–61; *Hale*, 219

2. In *Marchisheck v. San Mateo County*, 199 F.3d 1068 (9th Cir.1999), we affirmed a district court's grant of summary judgment on the merits to a county defendant in an FMLA suit charging a violation of § 2612(a)(1)(C). We did not inquire whether the county was there acting as "an arm of the state," *see Streit v. County of Los Angeles*, 236 F.3d 552,

559–65 (9th Cir.2001) (recognizing that a county can act as "an arm of the state"), or, if it was, discuss further the Eleventh Amendment immunity issue, *see Durning v. Citibank, N.A.*, 950 F.2d 1419, 1423 (9th Cir.1991) (recognizing that an agency acting as "an arm of the state" is entitled to Eleventh Amendment immunity).

F.3d at 65, 69; *Garrett,* 193 F.3d at 1219.[3] The difference matters because § 2612(a)(1)(C) can more plausibly be defended as an attempt to remedy gender discrimination. *See* Part III.A.3.d and e, *infra.* For this reason, none of our sister circuits' cases, except *Kazmier,* is particularly pertinent to the analysis of § 2612(a)(1)(C) under the Eleventh Amendment.

In Hibbs' case, the district court held that Nevada has not waived its Eleventh Amendment immunity. The court also held that the FMLA does not contain a sufficiently clear expression of congressional intent to abrogate Eleventh Amendment immunity, and that, in any case, the FMLA was not enacted pursuant to a valid exercise of the section 5 enforcement power. For the reasons given below, we conclude that the district court erred both in finding that congressional intent to abrogate is not sufficiently clear and in holding that the FMLA was not enacted pursuant to a valid exercise of Congress' section 5 power.

### 1. Waiver

■ Hibbs argues that Nevada has waived its immunity to private suits under the FMLA. Hibbs' argument is based on the following factual allegations: (1) Nevada has enacted a statute similar to the

FMLA; (2) Nevada state agencies post information in their offices regarding their employees' rights under the FMLA; and (3) Nevada state agencies teach seminars informing their employees of their rights under the FMLA.

■ We do not agree. The Supreme Court has held that Eleventh Amendment immunity cannot be constructively waived. *College Sav. Bank,* 527 U.S. at 678, 119 S.Ct. 2219 (describing with approval statements in prior cases that "there is 'no place' for the doctrine of constructive waiver in our sovereign-immunity jurisprudence" and that the Court will " 'find waiver only where stated by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction' " (quoting *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (alteration in original))); *id.* at 680, 94 S.Ct. 1347 (holding that "the constructive-waiver experiment of *Parden [v. Terminal Ry. of the Ala. State Docks Dep't,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964)] was ill conceived" and that "[w]hatever may remain of [the] decision in *Parden* is expressly overruled"). To waive its Eleventh Amendment immunity, a state must express its consent to suit unequivocally. *Cal. Franchise Tax Bd. v. Jackson (In re Jackson),* 184 F.3d 1046, 1049 (9th Cir.

**3.** The district courts are divided on the issue of Eleventh Amendment immunity under the FMLA. *Compare Post v. Kansas,* No. 98–1238–JTM, 1998 WL 928677, at *3 (D.Kan. Dec.10, 1998) (holding that the FMLA provision regarding ordinary sick leave does not validly abrogate Eleventh Amendment immunity); *Driesse v. Fla. Bd. of Regents,* 26 F.Supp.2d 1328, 1334 (M.D.Fla.1998) (same); *McGregor v. Goord,* 18 F.Supp.2d 204, 209 (N.D.N.Y. 1998) (same for FMLA provision regarding leave to care for an ailing family member); *Thomson v. Ohio State Univ. Hosp.,* 5 F.Supp.2d 574, 581 (S.D.Ohio 1998) (same as *McGregor*), *with Serafin v. Conn. Dep't of*

*Mental Health & Addiction Servs.,* 118 F.Supp.2d 274, 278 (D.Conn.2000) (holding that the FMLA provision regarding leave to care for an ailing family member does validly abrogate Eleventh Amendment immunity); *Biddlecome v. Univ. of Tex.,* No. 96–1872, 1997 WL 124220, at *3 (S.D.Tex. Mar.13, 1997) (same); *Jolliffe v. Mitchell,* 986 F.Supp. 339, 342–43 (W.D.Va.1997) (same for FMLA provision regarding ordinary sick leave); *Knussman v. Maryland,* 935 F.Supp. 659, 663 (D.Md.1996) (same for FMLA provision regarding parental leave, but reaching only the "express intent to abrogate" issue).

1999).[4] The alleged facts on which Hibbs relies would at most amount to an ambiguous constructive waiver, not the kind of unequivocal waiver that is required.[5] In addition, Nevada has expressly declined to waive its Eleventh Amendment immunity. Nev.Rev.Stat. 41.031(3) ("The State of Nevada does not waive its immunity from suit conferred by Amendment XI of the Constitution of the United States.").

For all of these reasons, the district court was correct in concluding that Nevada has not waived its immunity to private suits under the FMLA.

## 2. Express Congressional Intent to Abrogate

■ Both Hibbs and the United States argue that the district court erred in finding that the FMLA does not contain a sufficiently clear expression of congressional intent to abrogate state sovereign immunity. We agree that the district court erred.

In *Kimel,* the Supreme Court held that the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634, clearly expressed congressional intent to abrogate state sovereign immunity, because the ADEA incorporates by reference an enforcement provision of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219, that "clearly provides for suits by individuals against states." *Kimel,* 528 U.S. at 73–74, 120 S.Ct. 631. The FLSA provision authorizes suits by employees for legal and equitable relief, including back pay and reinstatement, "against any employer (including a public agency) in any Federal or State court of competent jurisdiction." 29 U.S.C. § 216(b). As the Court emphasized, "public agency" is defined as including both "the government of a State or political subdivision thereof" and "any agency of . . . a State, or a political subdivision of a State." *Id.* § 203(x); *see Kimel,* 528 U.S. at 74,'120 S.Ct. 631. The Court found that, read together, § 216(b) and § 203(x) clearly express congressional intent to abrogate state sovereign immunity from suits by individuals. *Kimel,* 528 U.S. at 74, 120 S.Ct. 631.

The enforcement provisions of the FMLA use language that is identical to the relevant language of the FLSA. The FMLA authorizes suits by employees "against any employer (including a public agency) in any Federal or State court of competent jurisdiction." 29 U.S.C. § 2617(a)(2). The FMLA's definition of "employer" includes "any 'public agency'

4. We have recognized a narrow litigation exception to this doctrine, but it is not applicable here. *See Katz v. Regents of the Univ.,* 229 F.3d 831, 834 (9th Cir.2000) (finding waiver of Eleventh Amendment immunity where the defense was never asserted in the district court and the university's general counsel submitted a declaration waiving the university's Eleventh Amendment waiver); *Hill v. Blind Indus. & Servs.,* 179 F.3d 754, 756–57 (9th Cir.1999) (holding that a state agency waived its Eleventh Amendment immunity by defending on the merits and waiting until the opening day of trial to assert its immunity defense). Defendants raised the defense of Eleventh Amendment immunity in their answer to Hibbs' complaint.

5. Moreover, the alleged facts probably do not even amount to a constructive waiver. Nevada's putative immunity from private suits under the FMLA does not imply that Nevada is not bound by the requirements of the FMLA or that Nevada is immune from enforcement suits brought by the United States. *Cf. Garrett,* 121 S.Ct. at 968 n. 9 (noting that even though the states are immune from private suits under the Americans with Disabilities Act ("ADA"), the states are still bound by the standards of the ADA, which are enforceable through actions brought by the United States). For this reason, Nevada can consistently (1) inform its employees that they have rights to various kinds of leave under the FMLA, and (2) deny that its employees can bring private suits to enforce those rights.

as defined in section 203(x) of this title." *Id.* § 2611(4)(A)(iii). The Court's decision in *Kimel* therefore compels the conclusion that the FMLA includes a sufficiently clear expression of congressional intent to abrogate state sovereign immunity. Every circuit that has addressed this question has agreed. *Chittister,* 226 F.3d at 228; *Sims,* 219 F.3d at 562; *Hale,* 219 F.3d at 67.

Thus, the district court erred in concluding that the FMLA does not contain a sufficiently clear expression of congressional intent to abrogate state sovereign immunity.

### 3. Valid Exercise of the Section 5 Power

#### a. Doctrinal Background

 Section 5 of the Fourteenth Amendment gives Congress the "power to enforce, by appropriate legislation, the provisions" of the amendment. U.S. Const. amend. XIV, § 5. Valid section 5 legislation must be aimed at remedying or deterring violations of the Fourteenth Amendment's substantive provisions, but it "is not limited to mere legislative repetition of [the Supreme Court's] constitutional jurisprudence." *Garrett,* 121 S.Ct. at 963; *see also Kimel,* 528 U.S. at 81, 120 S.Ct. 631. Because "[d]ifficult and intractable problems often require powerful remedies," *id.* at 89, 120 S.Ct. 631, "Congress' power to 'enforce' the Amendment includes the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text,"

*id.* at 81, 120 S.Ct. 631. *See Garrett,* 121 S.Ct. at 963.

 In enacting such prophylactic legislation, however, Congress must not cross the line between "appropriate remedial legislation" and legislation that amounts to "substantive redefinition of the Fourteenth Amendment right at issue." *Kimel,* 528 U.S. at 81, 120 S.Ct. 631. The Supreme Court has policed this boundary by requiring that there be " 'a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.' " *Id.* (quoting *City of Boerne v. Flores,* 521 U.S. 507, 520, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)); *see also Garrett,* 121 S.Ct. at 963. The congruence and proportionality inquiry requires a reviewing court (1) "to identify with some precision the scope of the constitutional right at issue," *Garrett,* 121 S.Ct. at 963, and (2) to determine whether the statute in question is "an appropriate remedy" for violations of that right, perhaps by scrutinizing the statute's legislative history, *Kimel,* 528 U.S. at 88, 120 S.Ct. 631. *See also id.* at 89, 120 S.Ct. 631 (" 'The appropriateness of remedial measures must be considered in light of the evil presented. Strong measures appropriate to address one harm may be an unwarranted response to another, lesser one.' " (quoting *City of Boerne,* 521 U.S. at 530, 117 S.Ct. 2157)).[6]

The recent Supreme Court cases developing and applying this doctrine have dealt with federal statutes that prohibit discrimination on the basis of age and disability. *See Garrett,* 121 S.Ct. at 967–68 (holding that the ADA is not valid section 5 legislation); *Kimel,* 528 U.S. at 91, 120 S.Ct. 631

---

**6.** In describing the congruence and proportionality inquiry, we have not followed our circuit's prior approach in *In re Mitchell,* 209 F.3d 1111. *In re Mitchell* was decided at essentially the same time as *Kimel* and con-

tains no citation to *Kimel.* We therefore take *Kimel* and *Garrett* to be superseding authority. There is no post-*Kimel* case law in our circuit on congruence and proportionality.

(same with respect to the ADEA). The Court's analyses in those cases depended heavily upon the fact that age and disability classifications are not subject to heightened scrutiny under the Equal Protection Clause. *See Garrett,* 121 S.Ct. at 963–64; *Kimel,* 528 U.S. at 83–89, 120 S.Ct. 631. Consequently, those cases offer limited guidance in the case at bench. Here, intervenor United States has defended the constitutionality of the FMLA on the ground that it is aimed at remedying and preventing gender discrimination, and gender discrimination is subject to heightened scrutiny. *See, e.g., United States v. Virginia,* 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (holding that state-sponsored gender discrimination violates equal protection unless it "serves important governmental objectives and ... the discriminatory means employed are substantially related to the achievement of those objectives" (internal quotation marks omitted)).

The post-*Seminole Tribe* case law from the circuit courts does little to clarify how the congruence and proportionality inquiry changes when the legislation is meant to remedy or prevent gender discrimination, rather than discrimination with respect to a nonsuspect classification. A number of circuits have held that the Equal Pay Act ("EPA") and Title IX of the Education Amendments of 1972 are valid section 5 legislation aimed at preventing gender discrimination, but the analysis in those cases is sparse and rests largely on the fact that the EPA and Title IX prohibit almost no conduct beyond what the Equal Protection Clause itself prohibits. *See Varner v. Ill. State Univ.,* 226 F.3d 927 (7th Cir.2000) (EPA); *Kovacevich v. Kent State Univ.,*

224 F.3d 806 (6th Cir.2000) (EPA); *Hundertmark v. Fla. Dep't of Transp.,* 205 F.3d 1272 (11th Cir.2000) (EPA); *O'Sullivan v. Minnesota,* 191 F.3d 965 (8th Cir. 1999) (EPA); *Ussery v. Louisiana,* 150 F.3d 431 (5th Cir.1998) (EPA); *Franks v. Ky. Sch. for the Deaf,* 142 F.3d 360 (6th Cir.1998) (Title IX); *Crawford v. Davis,* 109 F.3d 1281 (8th Cir.1997) (Title IX). Those cases consequently do not explain how legislation that is meant to prevent gender discrimination, but that sweeps substantially more broadly than the Equal Protection Clause, should be analyzed under section 5. Only *Kazmier,* which held that the FMLA provision regarding leave to care for an ailing family member (i.e., § 2612(a)(1)(C)) is not valid section 5 legislation, provides a detailed analysis of the issue. *See Kazmier,* 225 F.3d at 524–27.[7]

### b. Scope of the Constitutional Right at Issue

The first step in the congruence and proportionality inquiry is "to identify with some precision the scope of the constitutional right at issue." *Garrett,* 121 S.Ct. at 963. The United States defends § 2612(a)(1)(C) on the ground that it is meant to remedy and prevent unconstitutional gender discrimination.[8] The argument is supported by the text of the FMLA. *See* 29 U.S.C. § 2601(a)(5) ("Congress finds that ... due to the nature of the roles of men and women in our society, the primary responsibility for family caretaking often falls on women, and such responsibility affects the working lives of women more than it affects the working lives of men ...."); *id.* § 2601(b)(4) ("It is the purpose of this Act ... to accomplish

---

7. We address *Kazmier*'s analysis, which we find unpersuasive, in Part III.A.3.c, *infra.*

8. Hibbs himself presents no arguments regarding the validity of Congress' purported exercise of its section 5 power—his only Eleventh Amendment arguments relate to the clarity of Congress' expression of its intent to abrogate state immunity.

[the Act's previously described purposes] in a manner that, consistent with the Equal Protection Clause of the Fourteenth Amendment, minimizes the potential for employment discrimination on the basis of sex by ensuring generally that leave is available for eligible medical reasons (including maternity-related disability) and for compelling family reasons, on a gender-neutral basis....").

The United States argues that because women are regarded as having "the primary responsibility for family caretaking" (both for infants and for sick family members), employers commonly offer less caretaking leave to men than to women. The United States further concludes that this kind of gender-discriminatory leave policy is harmful both to men—because they are not given enough leave to care for their families—and to women—because reduced leave for men forces women to spend more time taking care of their families, and women's consequently greater needs for caretaking leave make them less attractive job candidates than men. Additionally, as we explain later, it appears that in enacting the FMLA Congress was also striving, in light of a long history of unconstitutional legislation mandating stereotypical family roles, to remedy the gender-discriminatory impact of employer policies that provide no family leave at all. The statute aims to remedy all these forms of discrimination by setting a gender-neutral minimum standard for the granting of caretaking leave. Cf. Laro, 259 F.3d at 12 (noting that the argument in support of a valid Eleventh Amendment waiver is stronger with respect to the parental and family-care leave provisions than it is with respect to personal medical leave).

 State-sponsored gender discrimination is subject to "intermediate scrutiny" under the Equal Protection Clause. Such discrimination is thus un-constitutional unless it is substantially related to the achievement of an important governmental interest. See, e.g., Wengler v. Druggists Mut. Ins. Co., 446 U.S. 142, 150, 100 S.Ct. 1540, 64 L.Ed.2d 107 (1980) ("[O]ur precedents require that gender-based discriminations must serve important governmental objectives and that the discriminatory means employed must be substantially related to the achievement of those objectives."). In addition, the burden is on the defender of such discrimination to prove that the standard has been met. See, e.g., Kirchberg v. Feenstra, 450 U.S. 455, 461, 101 S.Ct. 1195, 67 L.Ed.2d 428 (1981) ("[T]he burden remains on the party seeking to uphold a statute that expressly discriminates on the basis of sex to advance an exceedingly persuasive justification for the challenged classification." (internal quotation marks omitted)); Wengler, 446 U.S. at 151, 100 S.Ct. 1540 ("The burden ... is on those defending the discrimination to make out the claimed justification....").

 This allocation of the burden of proof has the effect of creating a rebuttable presumption of unconstitutionality for state-sponsored gender discrimination. This contrasts sharply with the treatment of age and disability classifications, which are subject to rational basis review. The burden is entirely on the challenger of state-sponsored age or disability discrimination to prove that the discrimination is not rationally related to any conceivable legitimate governmental interest. See Garrett, 121 S.Ct. at 964 ("[T]he burden is upon the challenging party to negative any reasonably conceivable state of facts that could provide a rational basis for the classification." (internal quotation marks omitted)); Kimel, 528 U.S. at 84, 120 S.Ct. 631 ("[T]he individual challenging [the discrimination] bears the burden of proving that the facts on which the classification is ap-

parently based could not reasonably be conceived to be true by the governmental decisionmaker." (internal quotation marks omitted)). In this way, such classifications are presumptively constitutional.

Judicial application of heightened scrutiny to state-sponsored gender discrimination is justified largely on the basis of the following analysis: (1) Gender differences are "so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy," *Kimel*, 528 U.S. at 83, 120 S.Ct. 631 (internal quotation marks omitted) (contrasting race and gender with age); and (2) Individuals who suffer discrimination on the basis of gender have "been subjected to a history of purposeful unequal treatment," *id.* (internal quotation marks omitted) (contrasting race and gender with age).

### c. Section 5 and Heightened Scrutiny

Section 2612(a)(1)(C) of the FMLA prohibits a broad range of state conduct that is not prohibited by the Equal Protection Clause's protection against invidious gender discrimination. Section 2612(a)(1)(C) does not merely prohibit gender discrimination in the states' granting of leave to their employees to care for ailing family members. Rather, it requires states to grant at least 12 weeks of such leave on a gender-neutral basis. If states granted only 11 or 10 weeks of such leave, or even none at all, and they did so in a gender-neutral manner, they presumably would not thereby be engaging in unconstitutional gender discrimination, without more, but would nonetheless violate § 2612(a)(1)(C). Thus, § 2612(a)(1)(C) sweeps more broadly than the Equal Protection Clause itself.

This fact does not, however, establish that § 2612(a)(1)(C) is not valid section 5 legislation. As the Supreme Court has explained, "[d]ifficult and intractable problems often require powerful remedies," which may include "reasonably prophylactic legislation." *Kimel*, 528 U.S. at 88, 120 S.Ct. 631. The question, then, is whether § 2612(a)(1)(C) is "just such an appropriate remedy or, instead, merely an attempt to substantively redefine States' legal obligations" under the Fourteenth Amendment. *Id.*

In answering this question, the Court in both *Kimel* and *Garrett* examined the relevant legislative histories to see if they contained evidence of the sort of difficult and intractable problems that would justify such broad remedies. *See Garrett*, 121 S.Ct. at 964–68; *Kimel*, 528 U.S. at 88–90, 120 S.Ct. 631. Moreover, the Court's opinion in *Garrett* could be taken to imply that adequate support in the legislative record is *always* a requirement for a valid exercise of Congress' section 5 power. *See Garrett*, 121 S.Ct. at 964 ("Once we have determined the metes and bounds of the constitutional right in question, we examine whether Congress identified a history and pattern of unconstitutional employment discrimination by the States against the disabled."). Such a requirement, however, would be at odds with both *Kimel* and at least one other post-*Seminole Tribe* decision of the Court. *See Kimel*, 528 U.S. at 88, 120 S.Ct. 631 (describing the examination of legislative history as merely "[o]ne means by which [the Court has] made such a determination in the past"); *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 646, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999) ("[T]he lack of support in the legislative record is not determinative. . . ."). In addition, for the courts to impose such a procedural requirement on Congress, in effect requiring that Congress gather and document sufficient evidence to support

the exercise of its constitutionally granted powers, would raise fundamental separation of powers concerns—the courts would be treating Congress more like an administrative agency than like a co-equal branch of the federal government. *Cf.* A. Christopher Bryant & Timothy J. Simeone, *Remanding to Congress: The Supreme Court's New "On the Record" Constitutional Review of Federal Statutes,* 86 Cornell L.Rev. 328, 373–83 (2001) (describing the constitutional difficulties with judicial imposition of such a procedural requirement on Congress).

■ For all of these reasons, we conclude that *Garrett* should not be taken to impose such a requirement, but rather should be interpreted as following *Kimel's* approach: Examination of legislative history is merely one means by which a court can determine whether the broad prophylactic legislation under consideration is justified by the existence of sufficiently difficult and intractable problems. *See also Kilcullen v. N.Y. State Dep't of Labor,* 205 F.3d 77, 80–81 (2d Cir.2000), *overruled on other grounds,* 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). "The ultimate question remains not whether Congress created a sufficient legislative record, but rather whether, given all of the information before the Court, it appears that the statute in question can appropriately be characterized as legitimate remedial legislation." *Id.* at 81.

■ There is a further point about *Kimel* and *Garrett's* treatment of the "appropriate remedy" inquiry that informs our analysis here: In each case, after failing to find in the legislative record sufficient evidence of a history and pattern of unconstitutional conduct by the states, the Court determined that the challenged federal statutes were not valid section 5 legislation. In effect, this approach means that the relevant provisions of the ADA and the ADEA were subject to a *presumption of unconstitutionality*—the burden was on the defenders of the legislation to prove that it was valid under section 5. While the creation of such a presumption might appear extraordinary and incongruous, it makes sense in light of the Court's emphasis on the fact that state-sponsored age and disability discrimination is *not* subject to heightened scrutiny. The presumption of unconstitutionality applied to the ADA and the ADEA thus is merely the flip side of the presumption of constitutionality that is accorded to state-sponsored age and disability discrimination. Because rational-basis review makes unconstitutional age and disability discrimination exceedingly uncommon, Congress must bear the heavy burden of proving that such discrimination really does exist to an extent that justifies broad use of its section 5 power.

■ For all of these reasons, we are persuaded that the FMLA should be treated differently from both the ADA and the ADEA because the FMLA is aimed at remedying gender discrimination, which is subject to heightened scrutiny. Because state-sponsored gender discrimination is presumptively unconstitutional, section 5 legislation that is intended to remedy or prevent gender discrimination is presumptively constitutional.[9] That is, the burden

---

9. As we noted in Part III.A.3.b, *supra,* the FMLA is expressly aimed at preventing gender discrimination. *See* 29 U.S.C. § 2601(a)(5), (b)(4). There is nothing in the record before this court to indicate that this stated purpose is in any sense a "sham," and the statistics on leave policies and historical record that we discuss *infra* indicate that there is a need for such a prophylactic measure. *Cf. Miss. Univ. for Women v. Hogan,* 458 U.S. 718, 727–30, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982) (concluding that "compensat[ing] for discrimination against women" could not be the "actual purpose" behind

is on the challenger of the legislation to prove that states have *not* engaged in a pattern of unconstitutional conduct. As the Supreme Court has acknowledged, the heightened scrutiny applied to state-sponsored gender discrimination reflects judicial recognition of the fact that persons who suffer discrimination on the basis of gender have been "subjected to a history of purposeful unequal treatment." *Kimel,* 528 U.S. at 83, 120 S.Ct. 631. Thus, the Court has long recognized just the kind of history of invidious gender discrimination by states that it was unable to find, in *Kimel* and *Garrett,* with respect to age and disability. It therefore makes sense to put the burden of proof on the challenger of a statute like the FMLA, to prove the absence of the sort of gender discrimination that the Court has found to be longstanding and widespread.

■ Consequently, we conclude that Congress has validly exercised its section 5 power by giving private individuals the right to sue states for violations of § 2612(a)(1)(C). Defendants have failed to show that there is not a widespread pattern of gender discrimination by states regarding the granting of leave to employees to care for sick family members or a historical record of state enforcement of stereotypical family roles.

We recognize that, in *Kazmier,* the Fifth Circuit held to the contrary, that Congress did not validly exercise its section 5 power in enacting § 2612(a)(1)(C). *Kazmier,* 225 F.3d at 526–27. The court's analysis closely tracks the analysis in *Kimel.* In particular, the only place at which the court took

the difference between age discrimination and gender discrimination into account was in determining the scope of the constitutional right whose violation the statute was meant to prevent. *See id.* at 525–26. Consequently, the court held the legislative history to the same exacting standard that was applied in *Kimel* (and subsequently in *Garrett* ): The legislative history must contain "evidence of *actual constitutional violations by the States* sufficient to justify the full scope of the statute's provisions." *Id.* at 524 (footnote omitted); *see also id.* ("Legislation that abrogates immunity must be proportional with and congruent to an *identified pattern* of actual constitutional violations by the States." (footnote omitted)).

We find *Kazmier* 's analysis unpersuasive and we decline to follow it, for the reasons we have given. In particular, (1) it assumes that adequate evidentiary support in the legislative history is *always* a requirement for a valid exercise of the section 5 power, and (2) it fails to acknowledge the ways in which the heightened scrutiny to which state-sponsored gender discrimination is subject justifies shifting or modifying the burden of proof in the legislative history inquiry.[10]

### d. Legislative History and Discrimination in Granting Leave

Alternatively, we also hold that the legislative history of the FMLA contains substantial evidence of gender discrimination with respect to the granting of leave to state employees, and that it therefore jus-

---

the policy of excluding men from the Mississippi University for Women School of Nursing, because statistics showed that women had long dominated the field of nursing).

**10.** *Kazmier* was decided by a divided panel. The dissent argued in part that when purported section 5 legislation is meant to remedy

race or gender discrimination, it should be analyzed under *Katzenbach v. Morgan* broad construction of the section 5 power, not *City of Boerne* and *Kimel* 's narrower approach. *See* 225 F.3d at 533–35 (Dennis, J., dissenting).

tifies the enactment of the FMLA as a prophylactic measure.

The FMLA's legislative history reflects that a 1990 Bureau of Labor Statistics (the "BLS") survey found that 37 percent of surveyed private-sector employees were covered by "maternity" leave policies, while only 18 percent were covered by "paternity" leave policies. S.Rep. No. 103-3, at 14–15, *reprinted in* 1993 U.S.C.C.A.N. 3, 17. The numbers from a similar BLS survey the previous year were 33 percent and 16 percent, respectively. *Id.* Thus, while these data show that a larger percentage of employees were covered in 1990 than in 1989, they also show a widening of the gender gap in leave policy during the same period. In addition, while the BLS surveyed only private employers, an extensive study of the private and public sectors done by the Yale Bush Center Infant Care Leave Project revealed that "[t]he proportion and construction of leave policies available to public sector employees differs little from those offered private sector employees." *The Parental and Medical Leave Act of 1986: Joint Hearing Before the Subcommittee on Labor–Management Relations and the Subcommittee on Labor Standards of the Committee on Education and Labor*, 99th Cong. 33 (1986) (prepared statement of Meryl Frank, Director of the Yale Bush Center Infant Care Leave Project); *see also id.* at 29–30 ("We did a survey of the public sector, a survey of Federal employees, all 50 States, and of the military. We have studied small businesses, mid-size businesses and large businesses to find out what they are offering. . . . We found that public sector leaves don't vary very much from private sector leaves.") (testimony of Meryl Frank, Director of the Yale Bush Center Infant Care Leave Project).

Taken together, the BLS and Yale Bush Center surveys constitute substantial evidence of unconstitutional state-sponsored gender discrimination in leave policies for state employees. The studies show significant gender-based disparities in the coverage of state leave *policies*. They thus indicate widespread *intentional* gender discrimination by states. Moreover, the studies show that this discrimination has persisted despite the existence of 42 U.S.C. § 1983 and Title VII, long after the 1978 enactment of the Pregnancy Discrimination Act made discrimination on the basis of pregnancy an actionable form of gender discrimination under Title VII. Altogether then, the studies show that states' discriminatory leave policies are just the sort of difficult and intractable problem that justifies broad prophylactic measures in response.

We recognize that a weakness in this evidence as applied to Hibbs' case is that the BLS and Yale Bush Center studies deal only with parental leave, not with leave to care for a sick family member. They thus do not document a widespread pattern of precisely the kind of discrimination that § 2612(a)(1)(C) is intended to prevent. But the studies do nonetheless constitute strong circumstantial evidence of state-sponsored gender discrimination in the granting of leave to care for a sick family member, because if states discriminate along gender lines regarding the one kind of leave, then they are likely to do so regarding the other.

Here again, the fact that the FMLA is aimed at remedying gender discrimination, rather than discrimination with respect to a nonsuspect classification, informs our analysis. Because the heightened scrutiny applied to state-sponsored gender discrimination reflects judicial recognition of the fact that persons who suffer discrimination on the basis of gender have been "subjected to a history of purposeful unequal treatment," *Kimel*, 528 U.S. at 83, 120 S.Ct. 631, we conclude that courts have

more latitude in drawing inferences from the legislative history of a federal statute aimed at remedying state-sponsored gender discrimination than in drawing inferences from the histories of statutes like the ADA and the ADEA, which aim to remedy discrimination with respect to non-suspect classifications. For this reason, we conclude that the evidence in the FMLA's legislative history is sufficient to justify Congress' broad use of its section 5 power in enacting § 2612(a)(1)(C). On this basis as well, then, we hold that Congress validly exercised its section 5 power when it gave state employees the right to sue their employers for violations of § 2612(a)(1)(C).[11]

### e. The FMLA As a Remedy for State Legislation Fostering Traditional Gender Roles**

There is one more basis for concluding that the FMLA fits within Congress' Fourteenth Amendment authority: In providing for minimum levels of leave for employees to care for family members, Congress was acting against a background of state-imposed systemic barriers to women's equality in the workplace that, under recent constitutional doctrine, were undoubtedly unconstitutional. The FMLA can be understood as, in part, an appropriately limited scheme designed to undo the impact of that history of state-supported and mandated sex discrimination as it continues to affect private and public employment.

The modern trend noted above to provide more generous family care leave to women is related to that historical background: That trend reflects the flip side of the stereotypical assumption that women are marginal workers whose fundamental responsibilities are in the home. At the same time, the framers of the FMLA were

---

**11.** The fact that the statute grants a substantive benefit, namely, 12 weeks of leave, to all employees does not mean that it cannot constitute valid enforcement legislation under section 5. The statute aims to prevent gender discrimination in the granting of leave by guaranteeing a minimum level of leave on a gender-neutral basis. When narrow antidiscrimination measures like Title VII and § 1983 have proven ineffective, broad prophylactic legislation is justified, as the Court recognized in *Kimel. See* 528 U.S. at 88–89, 120 S.Ct. 631. In addition, the seeming arbitrariness of guaranteeing 12 weeks, rather than 11 or 10 or some other number, cannot be determinative. Prophylactic legislation will always, by definition, prohibit more conduct than the Equal Protection Clause itself, and any line that Congress draws that extends beyond the Constitution's requirements will seem to some extent arbitrary. Compare *Katzenbach v. Morgan*, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), in which the Court found that Congress had validly exercised its section 5 power by enacting a statute that

> provides that no person who has successfully completed the sixth primary grade in a public school in, or a private school accredited by, the Commonwealth of Puerto Rico in which the language of instruction was other than English shall be denied the right to vote in any election because of his inability to read or write English.

*Id.* at 643, 86 S.Ct. 1717. The Court was not troubled by the fact that the statute provides a substantive benefit that is not required by the Equal Protection Clause, namely, freedom from literacy requirements in the exercise of voting rights. Nor was the Court bothered by Congress' choice of the sixth grade, rather than the fifth or fourth or some other grade, as the threshold condition for entitlement to the benefit. Although *Morgan*'s broad construction of the section 5 power, as analogous to Congress' power under the Necessary and Proper Clause, has been superseded by the narrower approach of *City of Boerne* and its progeny, the Court has never overruled *Morgan* or even hinted that it is no longer good law on its facts.

** This section was authored by Judge Berzon, originally as a separate concurring opinion. Because the panel unanimously agrees with its reasoning, it is included as Part III.A.3.e of the court's opinion.

at least equally concerned with the failure of many employers to provide family care leave to *anyone*, with the result—given the history of state-supported treatment of women as nonessential workers, with principal responsibility for the family—that women most often were the ones who left their jobs to care for family members. While the failure to provide any such leave is not itself unconstitutional, Congress was acting not in a vacuum but against the background of unconstitutional state laws concerning the role of women in the workplace. Congress therefore appropriately enacted the FMLA under the Fourteenth Amendment as, in part, a congruent and proportional remedy for the continuing effects of past unconstitutional gender discrimination in employment *by the states*, readjusting workplace norms in both private and public workplaces so as to foster equal participation in both economic and domestic life by both men and women.

#### (i) The Historical Record

 "There can be no doubt that our Nation has had a long and unfortunate history of sex discrimination." *Frontiero v. Richardson*, 411 U.S. 677, 684, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (plurality opinion) (quoted in *Virginia*, 518 U.S. at 531, 116 S.Ct. 2264); *see also Kimel*, 528 U.S. at 83, 120 S.Ct. 631 (recognizing "a history of purposeful unequal treatment" on the basis of gender). That history

underlies the modern jurisprudence recounted above, requiring "[p]arties who seek to defend gender-based government action [to] demonstrate an 'exceedingly persuasive justification' for that action." *Virginia*, 518 U.S. at 531, 116 S.Ct. 2264. Because "[t]oday's skeptical scrutiny of official action denying rights or opportunities based on sex responds to volumes of history[,]" *id.*, some detailed consideration of relevant aspects of that history is useful in evaluating the appropriate role of Congress when acting under section 5 of the Fourteenth Amendment to end sex discrimination.

In the employment context, from the beginning of our Nation's history until at least the 1970's, state laws supported a regime in which men and women were assigned, respectively, roles as workers and homemakers. State labor legislation, in the guise of protecting women, played a major role in limiting women's access to the workplace—and concomitantly, in discouraging the involvement of men in domestic duties, including caring for children and relatives.

 Before 1969, every state had some form of labor legislation "protective" of women only.[12] Judith A. Baer, *The Chains of Protection: The Judicial Response to Women's Labor Legislation* 4 (1978) ("hereinafter '*Chains of Protection*'"). By 1917, thirty-eight states had laws limiting in some way the hours that

12. Good intentions—including the desire to protect women from harmful work conditions—do not render such gender classifications constitutional. *See Miss. Univ. for Women*, 458 U.S. at 725, 102 S.Ct. 3331 ("[I]f the statutory objective is to exclude or 'protect' members of one gender because they are presumed to suffer from an inherent handicap or to be innately inferior, the objective itself is illegitimate."); *Virginia*, 518 U.S. at 533, 116 S.Ct. 2264 (gender classifications "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females"); *see also Sail'er Inn, Inc. v. Kirby*, 5 Cal.3d 1, 95 Cal.Rptr. 329, 485 P.2d 529, 541 (1971) ("Laws which disable women from full participation in the political, business and economic arenas are often characterized as 'protective' and beneficial. Those same laws applied to racial or ethnic minorities would readily be recognized as invidious and impermissible. The pedestal upon which women have been placed has all too often, upon closer inspection, been revealed as a cage.").

women—but not men—could work for wages. Barbara Allen Babcock et al., *Sex Discrimination and the Law: Causes and Remedies* 247 (1975) (hereinafter *"Causes and Remedies"*); *see also Muller v. Oregon*, 208 U.S. 412, 419 n. 1, 28 S.Ct. 324, 52 L.Ed. 551 (1908) (listing—and approving—laws from 19 states limiting the hours that women could work). And, as is true of the other sex discriminatory laws discussed below, hours laws remained on the books well into the second half of the 20th century. *See, e.g., Corning Glass Works v. Brennan*, 417 U.S. 188, 193 n. 7, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974) (Pennsylvania and New York laws not repealed until 1969, and had continuing impact thereafter on women's wages); *Rosenfeld v. So. Pac. Co.*, 293 F.Supp. 1219 (C.D.Cal.1968).

Hours laws took two forms: A majority of states enacted laws setting a maximum number of hours that women could work in certain industries, without so legislating for men. *People v. Elerding*, 254 Ill. 579, 98 N.E. 982, 985 (1912) (stating that by 1912, twenty-seven states had adopted such laws).[13] Maximum hours laws barred women from earning overtime and hin-

dered women's employment opportunities by excluding them from jobs requiring overtime. Wendy W. Williams, *The Equality Crisis: Some Reflections on Culture, Courts, and Feminism*, 14 Women's Rts. L. Rep. 151, 170 n.114 (1992) (hereinafter *"Equality Crisis"*).

Other state laws prohibited the employment of women—but, again, not men—during night hours. *People v. Charles Schweinler Press*, 214 N.Y. 395, 404, 108 N.E. 639 (N.Y.1915) (affirming a law prohibiting women from working in factories at night, and noting that by 1913 nine other states had passed such laws).[14] Night hour laws precluded women not only from working night shift jobs but also from obtaining more desirable day shift jobs that required employees initially to work night hours. *Equality Crisis* at 170 n.114.

States legislatures also limited women's employment opportunities by placing a restriction on the amount of weight that women (but not men) could lift on the job,[15] and by prohibiting women (but again, not men) from cleaning moving machinery,

---

**13.** *See also, e.g., Radice v. New York*, 264 U.S. 292, 44 S.Ct. 325, 68 L.Ed. 690 (1924); *Bosley v. McLaughlin*, 236 U.S. 385, 35 S.Ct. 345, 59 L.Ed. 632 (1915) (California statute); *Ex parte Miller*, 162 Cal. 687, 124 P. 427 (1912), *aff'd, Miller v. Wilson*, 236 U.S. 373, 35 S.Ct. 342, 59 L.Ed. 628 (1915); *Elerding*, 98 N.E. at 985 (Illinois statute); *Commonwealth v. Riley*, 210 Mass. 387, 97 N.E. 367 (1912), *aff'd*, 232 U.S. 671, 34 S.Ct. 469, 58 L.Ed. 788 (1914); *Commonwealth v. Hamilton Mfg. Co.*, 120 Mass. 383 (Mass.1876); *Withey v. Bloem*, 163 Mich. 419, 128 N.W. 913 (1910); *Wenham v. State*, 65 Neb. 394, 91 N.W. 421 (1902); *Stettler v. O'Hara*, 69 Or. 519, 139 P. 743 (1914) (en banc), *aff'd, Simpson v. O'Hara*, 243 U.S. 629, 37 S.Ct. 475, 61 L.Ed. 937 (1917); *State v. Muller*, 48 Or. 252, 85 P. 855 (1906), *aff'd*, 208 U.S. 412, 28 S.Ct. 324, 52 L.Ed. 551 (1908); *State v. Somerville*, 67 Wash. 638, 122 P. 324 (1912); *State v. Buchanan*, 29 Wash. 602, 70 P. 52 (Wash.1902).

**14.** *See also, e.g., Radice*, 264 U.S. at 293, 44 S.Ct. 325 (New York law prohibiting women from working in restaurants at night); *Wenham*, 91 N.W. at 422 (Nebraska statute); *see also* Eliot A. Landau & Kermit L. Dunahoo, *Sex Discrimination in Employment: A Survey of State and Federal Remedies*, 20 Drake L.Rev. 417, 448 (1971) (hereinafter *"Sex Discrimination"*) (in 1969, eighteen states had night hour laws applicable to women only).

**15.** *See, e.g., Weeks v. Southern Bell Tel. & Tel. Co.*, 408 F.2d 228 (5th Cir.1969) (Georgia statute); *Richards v. Griffith Rubber Mills*, 300 F.Supp. 338 (D.Ore.1969); *Rosenfeld*, 293 F.Supp. at 1224 (California statute); *see also Sex Discrimination* 450 (10 states had such laws in 1969).

*Chains of Protection* at 31 (fourteen machinery laws by 1908). Likewise, state laws requiring that women receive lunch breaks or rest periods made women less desirable employees than men.[16]

Between 1912 and 1923, fifteen states passed minimum wage laws for women only. *Causes and Remedies* 247.[17] As the Supreme Court recognized, "prescribing of minimum wages for women alone ... restrain[ed] them in competition with men and tend[ed] arbitrarily to deprive them of employment and a fair chance to find work." *New York ex rel. Tipaldo*, 298 U.S. at 617, 56 S.Ct. 918.[18]

State laws also barred women from certain occupations, either by outright prohibitions or by refusing to grant women necessary licenses. The occupations from which some states excluded women completely included the practice of law,[19] working as a bartender or in an establishment selling liquor,[20] mining,[21] and wrestling.[22]

In addition, state laws providing that widows, but not widowers, automatically received workers' compensation or similar benefits at the death of a working spouse[23] discriminated against women workers because of the "offensive assumption ... that male workers' earnings are vital to the support of their families, while the earnings of female wage earners do not significantly contribute to their families' support." *Wengler*, 446 U.S. at 142, 100 S.Ct. 1540 (internal quotation marks and citation omitted).[24]

**16.** *See, e.g., Burns v. Rohr Corp.*, 346 F.Supp. 994 (S.D.Cal.1972); *see also Sex Discrimination* 447 (In 1969, twenty-two states required that employers grant women lunch breaks, and thirteen states required that employers grant women rest breaks; these laws did not apply to male employees.).

**17.** *See also, e.g., West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937) (Washington statute); *Morehead v. New York ex rel. Tipaldo*, 298 U.S. 587, 56 S.Ct. 918, 80 L.Ed. 1347 (1936); *Topeka Laundry Co. v. Court of Industrial Relations*, 119 Kan. 12, 237 P. 1041 (1925); *Stevenson v. St. Clair*, 161 Minn. 444, 201 N.W. 629 (1925); *Stettler*, 139 P. at 749 (Oregon statute).

**18.** In 1969 ten states still had minimum wage laws applicable to women only. *Sex Discrimination* 449.

**19.** *See, e.g., In re Bradwell*, 55 Ill. 535 (Ill. 1869), *aff'd, Bradwell v. Illinois*, 83 U.S. (16 Wall.) 130, 21 L.Ed. 442 (1872); *In re Lavinia Goodell*, 39 Wis. 232, 1875 WL 3615 (1875); *In re Application of Martha Angle Dorsett to Be Admitted to Practice as Attorney and Counselor at Law* (Minn. C.P. Hennepin Cty., 1876), in *The Syllabi*, Oct. 21, 1876, pp. 5, 6 (cited in *Virginia*, 518 U.S. at 543, 116 S.Ct. 2264).

**20.** *Goesaert v. Cleary*, 335 U.S. 464, 69 S.Ct. 198, 93 L.Ed. 163 (1948) (Michigan statute); *Henson v. City of Chicago*, 415 Ill. 564, 114 N.E.2d 778 (1953); *Blair v. Kilpatrick*, 40 Ind. 312 (Ind.1872); *Sail'er Inn, Inc.*, 95 Cal.Rptr. 329, 485 P.2d at 531 (California statute); *Ex parte Hayes*, 98 Cal. 555, 33 P. 337 (Cal.1893); *State v. Considine*, 16 Wash. 358, 47 P. 755, *aff'd, In re Considine*, 83 F. 157 (D.Wash. 1897).

**21.** U.S. Dep't of Labor, *Summary of State Laws for Women* 17 (1969) (in 1969, seventeen states had laws prohibiting the employment of women in mines).

**22.** *Oregon v. Hunter*, 208 Or. 282, 300 P.2d 455 (1956) (en banc).

**23.** *See, e.g., Wengler*, 446 U.S. 142, 100 S.Ct. 1540, 64 L.Ed.2d 107 (Missouri statute); *Arp v. Workers' Compensation Appeals Bd.*, 19 Cal.3d 395, 138 Cal.Rptr. 293, 563 P.2d 849 (1977); *Passante v. Walden Printing Co.*, 53 A.D.2d 8, 385 N.Y.S.2d 178 (1976); *Tomarchio v. Township of Greenwich*, 75 N.J. 62, 379 A.2d 848 (1977).

**24.** State laws outside the labor context also perpetuated the ideology of separate spheres. For instance, "alimony statutes were part and parcel of a larger statutory scheme which invidiously discriminated against women, removing them from the world of work and property and 'compensating' them by making their designated place 'secure.'" *Orr v. Orr*,

In upholding the discriminatory laws described above, state courts made clear that the basis, and validity, of such laws lay in stereotypical beliefs about the appropriate roles of men and women.[25] For instance, in upholding an hours law, the Supreme Court of Illinois relied upon the need for women to conserve their energy for "the proper discharge of the maternal functions" and "the maintenance of the home." *Elerding*, 98 N.E. at 985. The Supreme Court of Nebraska found similar legislation valid because of its concern that if women worked longer hours in the workplace they would be "incapable of bearing their share of the burdens of the family and the home." *Wenham*, 91 N.W. at 425 (quoted in *Muller*, 85 P. at 857). Likewise, the Court of Appeals of New York noted that night work interfered with "the peculiar functions which have been imposed upon [women] by nature." *Charles Schweinler Press*, 214 N.Y. at 400–03, 405–06, 108 N.E. 639. The legislature was justified in enacting the night hours law not only for women's sake, said the New York court, "but, as is and ought to be constantly and legitimately emphasized,

for the sake of the children whom a great majority of them will be called on to bear." *Id.*[26]

"Such judgments have attended, and impeded, women's progress toward full citizenship stature throughout our Nation's history." *Virginia*, 518 U.S. at 542, 116 S.Ct. 2264. Although the FMLA's legislative history does not specifically recount this background, as we hold above, when our nation's judicial history already documents unconstitutional discrimination against the class at issue, there is no need for Congress, separately and redundantly, to provide detailed findings of such discrimination in order to exercise its Fourteenth Amendment powers. *See Garrett*, 531 U.S. at 375–76, 121 S.Ct. 955 (Kennedy, J., concurring) ("If the States had been transgressing the Fourteenth Amendment by their mistreatment or lack of concern for those with impairments, one would have expected to find in decisions of the courts of the States and also the courts of the United States extensive litigation and discussion of the constitutional violations.").[27]

440 U.S. 268, 279 n. 9, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979). Although alimony provided a benefit to the individual woman who received it, "[l]egislative classifications which distribute benefits and burdens on the basis of gender carry the inherent risk of reinforcing the stereotypes about the 'proper place' of women and their need for special protection." *Id.* at 283, 99 S.Ct. 1102. States also discriminated against women in the field of education, depriving women of future opportunities in the marketplace. *See, e.g., Virginia*, 518 U.S. at 557, 116 S.Ct. 2264.

25. Because this case hinges on the impact of the Eleventh Amendment, we have focused only on state court opinions upholding state sex discrimination in employment. We recognize, however, that federal as well as state legislation and court opinions shaped and perpetuated the notion that governmental action could constitutionally relegate domestic duties principally to women. *See, e.g., Goes-*

*aert*, 335 U.S. at 465–66, 69 S.Ct. 198 (federal court relying on the separate spheres ideology to uphold a discriminatory state law); *Muller*, 208 U.S. at 420–23, 28 S.Ct. 324 (same); *see also, e.g., Weinberger v. Wiesenfeld*, 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975) (striking down federal social security law incorporating similar gender stereotypes).

26. For other similar statements, *see, e.g., Buchanan*, 29 Wash. at 610, 70 P. 52; *Withey*, 128 N.W. at 917; *Ex parte Miller*, 162 Cal. at 695, 124 P. 427; *Stettler*, 139 P. at 748; *J.B. v. A.B.*, 161 W.Va. 332, 242 S.E.2d 248, 252 (1978); *Hunter*, 300 P.2d at 458.

27. We have held that, because gender discrimination is subject to heightened scrutiny, "the burden is on the challenger of the legislation to prove that states have *not* engaged in a pattern of unconstitutional conduct." Part III.A.3.c, *supra*, at 24. Regardless of the bur-

### (ii) A Remedy Needed

As late as 1961, the Supreme Court upheld a gender classification because "woman is still regarded as the center of home and family life." *Hoyt v. Florida,* 368 U.S. 57, 62, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961). Only in 1971 did the Court find for the first time that a state law violated the Equal Protection Clause because it arbitrarily discriminated on the basis of sex. *See Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). By this time, Congress had already enacted the Equal Pay Act of 1963 and Title VII of the Civil Rights Act of 1964 to prohibit gender discrimination in the workplace. 29 U.S.C. § 206(d); 42 U.S.C. § 2000e, *et seq.* In 1978, Congress amended Title VII to include the Pregnancy Discrimination Act, which barred discrimination on the basis of pregnancy. 42 U.S.C. § 2000e(k).

 As we have seen, the Court soon settled on a heightened standard of review for state-imposed gender classifications, requiring "an exceedingly persuasive justification" that is "substantially related" to "important governmental objectives" to validate classifications. *Virginia,* 518 U.S. at 533, 116 S.Ct. 2264 (citing *Miss. Univ. for Women,* 458 U.S. at 724, 102 S.Ct. 3331, and *Wengler,* 446 U.S. at 150, 100 S.Ct. 1540); *see also Kirchberg v. Feenstra,* 450 U.S. 455, 461, 101 S.Ct. 1195, 67 L.Ed.2d 428 (1981). Under heightened scrutiny, "[s]tate actors controlling gates to opportunity ... may not exclude qualified individuals based on 'fixed notions concerning the roles and abilities of males and females.'" *Virginia,* 518 U.S. at 541, 116 S.Ct. 2264 (quoting *Miss. Univ. for Women,* 458 U.S. at 725, 102 S.Ct. 3331); *see also id.* at 532, 116 S.Ct. 2264 (the Constitution mandates for all citizens, regardless of gender, an "equal opportunity to aspire, achieve, participate in and contribute to society based on their individual talents and capacities.").

Heightened constitutional scrutiny and federal laws prohibiting gender discrimination in the workplace could not, however, erase the "volumes of history" of sex discrimination in this country. *Id.* at 531, 116 S.Ct. 2264. State support for stereotypical gender roles had allowed American employers—including the states—to develop and function without accommodating workers' home responsibilities during emergencies. Because women filled the caretaking role during times of crisis, men were expected to continue their work without interruption from domestic responsibilities. And, even as women entered the workplace in greater numbers, the continuing expectation that women would assume responsibility for domestic concerns put a burden on both working women and working men, hindering women's ability to compete equally in the marketplace while making it difficult for men and women to recast family responsibilities by sharing critical responsibilities at home.

Before enacting the FMLA, Congress heard testimony that

> our social structures, and most particularly our employment policies, continue to operate as if women's role is to stay home and care for the family and men's role is to work outside the home for a pay check.... [W]e have not accommodated our institutions to the simple reality that men and women no longer operate in separate spheres, but rather that all employees, male and female, have family as well as employment responsibilities. Such accommodation is neces-

---

den of proof, however, abundant evidence of unconstitutional state discrimination on the

basis of sex exists.

sary if workers, and especially women workers, are to be able to exercise their right to equal employment and at the same time to preserve their family lives. *The Family and Medical Leave Act of 1987: Joint Hearings Before the Subcomm. on Labor–Management Relations and the Subcomm. on Labor Standards of the Comm. on Education and Labor,* 100th Cong. (1987) (statement of Donna Lenhoff, Associate Director, Women's Legal Defense Fund). The FMLA preamble and legislative history quite explicitly reflect this same understanding of the historical dynamic, and an intent to change it: Congress specifically found that "due to the nature of the roles of men and women in our society, the primary responsibility for family caretaking often falls on women, and such responsibility affects the working lives of women more than it affects the working lives of men." § 2601(a)(5); *see also* H.R.Rep. No. 103–8(I), at 16–17 (1993) ("The typical worker is no longer a man supporting a wife who stays at home, with the woman caring for the children and tending to other family needs.... Yet our workplaces are still too often modeled on the unrealistic and outmoded idea of workers unencumbered by family responsibilities."); S.Rep. No. 102–68, at 37 (1991) ("In the absence of a family leave standard, childbirth and the need to care for a sick child or parent have an adverse impact on women's earnings.").[28]

The FMLA's legislative history documents statistically the harmful and extant effects of stereotypical gender roles on women's participation in the workplace immediately prior to the Act's enactment. The evidence revealed that women still bore the brunt of domestic responsibilities in American society, and that this burden hindered women's participation in the paid workforce.

Specifically, Congress found that "[t]wo-thirds of the nonprofessional caregivers for older, chronically ill, or disabled persons are working women, the most common caregiver being a child or spouse." H.R.Rep. No. 103–8(I), at 24 (1993); S.Rep. No. 103–3, at 7, *reprinted in* 1993 U.S.C.C.A.N. at 9. The "cost of elder care is estimated at $4.8 billion annually in lost income (*mostly to women*)...." S.Rep. No. 102–68, at 28 (1991) (emphasis added). (1993). A 1990 study "concluded that 'caring for elderly parents forces large numbers of women in the labor force to cut their hours, take time off without pay, and rearrange job schedules.' Indeed the study estimated that *11 to 13% of women caring for elderly parents actually quit their jobs to provide care.*" H.R.Rep. No. 102–135(I), at 20 (1991) (emphasis added).

Further, the record before Congress indicated that most state employers had not developed family leave policies concomitant with those provided for in the FMLA. H.R.Rep. No. 103–8(I), at 78–83 (1993) (Minority Views Attachment B (information provided by Dep't of Labor)). When the FMLA was enacted, many states had enacted no family or medical leave law

---

**28.** In a similar vein, some members of Congress noted that:

the traditional family where the father is present as breadwinner and mother stays at home, is no longer the norm.... While women are no longer at home to be the primary caregivers to sick children, spouses, or elderly parents, family responsibilities have not diminished.... But those who must meet their family responsibilities are often faced with the necessity of making a living and being a caregiver.

H.R.Rep. No. 103–8(I), at 86 (1993) (additional views of Representatives Roukema and Molinari); *see also* H.R.Rep. No. 103–8(II), at 86 (1993) (Supplemental Views of Constance A. Morella) (stating that women "continue to be the primary caregivers of children, elderly parents and relatives.").

applicable to state or private sector employees, and many more had either no provisions regarding family care leave for state employees or provided family leave care for state employees so limited that, as a practical matter, employees lacked job security if a relative needed care for a prolonged illness. *Id.* Congress also recognized that if a government employer does not follow a uniform leave policy, discretionary treatment can lead to unequal treatment of employees (especially, for instance, in the granting of parental leave), H.R. Rep. 103–8(II), at 10–11 (1993), perpetuating stereotypical gender roles.

### (iii) The FMLA Remedy and the Historical Record

The FMLA preamble declares:

It is the purpose of this Act—

. . . . .

(4) to[,] . . . consistent with the Equal Protection Clause of the Fourteenth Amendment, minimize[ ] the potential for employment discrimination on the basis of sex by ensuring that leave is available for eligible medical reasons (including maternity-related disability) and for compelling family reasons, on a gender-neutral basis; and

(5) to promote the goal of equal employment opportunity for women and men, pursuant to [the Equal Protection Clause of the Fourteenth Amendment].

§ 2601(b).

Section 2612(a)(1)(C) of the FMLA, providing for unpaid leave to care for an immediate family member of the employee, serves Congress' general "goal of equal employment opportunity for women and men" in several ways:

First, emergencies do arise that require the care of a family member. By providing for a period of job-protected unpaid leave, the FMLA allows women to participate in the public sphere despite the occasional and temporary, but pressing, needs of family members—and despite the inherited assumption of many employers, derived in part from a history of state-sponsored stereotypical gender roles, that workers have another (female) family member to handle emergencies at home.

Second, by allowing both male and female employees reasonable emergency family leave, the FMLA "permits families to choose which parent or sibling will attend to extraordinary family responsibilities in light of the family's preferences, needs, career concerns, and economic considerations." H.R.Rep. No. 103–8(I), at 36 (1993). Under federal policy, then, domestic duties no longer belong to women only, but can be assumed by any adult family member. By allowing either women or men to take responsibility for pressing domestic concerns, according to the family's preferences, the FMLA provides women the opportunity to participate fully in the marketplace. This flexibility offers women (and men) the opportunity to overcome the stereotypical gender roles fostered and perpetuated by the states.

Third, as already discussed, by providing for family-care leave on a *gender neutral* basis, Congress also counteracted any tendency by employers either to refuse to hire women because of their presumed higher need for family-care leave, or to "afford such leave to women but not to men, thus reinforcing gender roles." *Laro,* 259 F.3d at 12;[29] *see* H.R.Rep. No.

---

**29.** *Laro,* while holding that Congress could not validly enact under section 5 of the Fourteenth Amendment the provision of the FMLA

relating to the worker's own health conditions (§ 2612(a)(1)(D)), stated that "the constitutional arguments in support of the remaining

103–8(I), at 29 (1993) ("A law providing special protection to women ... in addition to being inequitable, runs the risk of causing discriminatory treatment. [This legislation], by addressing the needs of all workers, avoids such a risk.")

Additionally, the heightened scrutiny of gender-based classifications would almost surely have precluded leave-protection that was *not* gender neutral. *Cf. Wiesenfeld*, 420 U.S. at 643, 645, 95 S.Ct. 1225; *Virginia*, 518 U.S. at 533, 116 S.Ct. 2264. It is for this reason, presumably, that Congress in the preamble to the FMLA specified the need to accomplish the purposes of the Act "in a manner ... consistent with the Equal Protection Clause of the Fourteenth Amendment." § 2601(b)(4).

### (iv) Congruence and Proportionality

The FMLA takes a modest step towards eliminating the negative impact of, and discrimination based upon, the stereotypical gender roles that have restricted women's opportunities in the workplace. The FMLA, once again, requires only that an employee receive an optional 12–week–maximum, *unpaid*, equivalent-job-guaranteed leave, without loss of benefits, if he or she, or another immediate family member, suffers a serious health condition or if a child is born to or adopted by the employee. §§ 2612(a), 2614(a).[30]

The FMLA, of course, does not simply prohibit employment discrimination on the basis of sex or pregnancy— Congress had already prohibited such discrimination in Title VII and the Pregnancy Discrimination Act. And Congress may not use its section 5 powers to redefine the substantive rights guaranteed by the Fourteenth Amendment. *City of Boerne*, 521 U.S. at 519, 117 S.Ct. 2157 ("Congress does not enforce a constitutional right by changing what the right is."). But remedial legislation under section 5 of the Fourteenth Amendment, we reiterate, may reach state conduct that would survive constitutional scrutiny under the Amendment. *See Kimel*, 528 U.S. at 81, 120 S.Ct. 631 ("Congress' § 5 power is not confined to the enactment of legislation that merely parrots the precise wording of the Fourteenth Amendment. Rather, Congress' power 'to enforce' the Amendment includes the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text."); *see also City of Boerne*, 521 U.S. at 518, 117 S.Ct. 2157 ("Legislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved

provisions have greater strength ... (for instance, their implications for family roles)." *Laro*, 259 F.3d at 9 n. 6; *see also id.* at 12 (stating that the arguments supporting the constitutionality of the family leave provisions, based on the proposition that "Congress might reasonably seek to break the cycle of stereotyping and discrimination by requiring gender-neutral leave policies for family care," "may all be true.").

We do not mean here to state any view with regard to the personal disability provision of the FMLA.

**30.** The FMLA does not apply if an employee has not worked for the employer for at least 12 months and for at least 1,250 hours during the previous twelve-month period. § 2611(2). If the need for leave is foreseeable, the employee must give the employer at least 30 days notice if practicable. § 2612(e). The employer may request certification and a second opinion regarding the need for leave. § 2613. Other limitations in the Act will be discussed as relevant below.

to the States.'" (quoting *Fitzpatrick v. Bitzer*, 427 U.S. 445, 455, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976))).

As recounted above, in enacting the FMLA, Congress appropriately sought to counteract the various problems for gender equality in public and private workplaces created by workplace policies that reflect traditional, formerly state-supported assumptions about gender roles in the domestic and public spheres. Additionally, Congress sought to deter future intentional discrimination against women based on those same stereotypes.

 There is, as we have seen, ample precedent, consistent with the Supreme Court's recent section 5 jurisprudence, for such "reasonably prophylactic legislation" to remedy "difficult and intractable" problems. *Kimel*, 528 U.S. at 88, 120 S.Ct. 631; *Virginia*, 518 U.S. at 547, 116 S.Ct. 2264 ("A proper remedy for an unconstitutional exclusion ... aims 'to eliminate [so far as possible] the discriminatory effects of the past....'" (quoting *Louisiana v. United States*, 380 U.S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965))). Most relevant here, carefully crafted legislation that recognizes and seeks to cure the continuing negative impact of pervasive past *unconstitutional* state discrimination therefore can come within Congress' section 5 authority. *South Carolina v. Katzenbach*, 383 U.S. 301, 334, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966) ("Congress knew that continuance of the tests and devices in use at the present time, no matter how fairly administered in the future, would *freeze the effect of past discrimination* in favor of unqualified white registrants." (emphasis added)); *see also Lopez v. Monterey County*, 525 U.S. 266, 283, 119 S.Ct. 693, 142 L.Ed.2d 728 (1999) (Congress "may guard against both discriminatory animus and the potentially harmful *effect* of neutral laws...." (emphasis in original)); *City of Rome v. United States*, 446 U.S. 156, 176, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980) (Congress may, under the authority of section 2 of the Fifteenth Amendment, prohibit state action that ... perpetuates the effects of past discrimination.); *id.* (construing the various opinions in *Oregon v. Mitchell*, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970), as similarly permitting legislation that "attack[s] the perpetuation of earlier, purposeful racial discrimination"); *cf. City of Boerne*, 521 U.S. at 528, 117 S.Ct. 2157 (noting that the voting rights provision requiring New York to permit most Puerto Ricans to vote despite inability to read English, upheld in *Katzenbach v. Morgan*, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828(1966), "could be justified as a remedial measure to deal with 'discrimination in governmental services,'" because that rationale "rested on unconstitutional discrimination by New York and Congress' reasonable attempt to combat it.").[31]

 As to the "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end," *Garrett*, 121 S.Ct. at 963 (quoting *City of Boerne*, 521 U.S. at 520, 117 S.Ct. 2157), congruence and proportionality of remedial legislation "must be judged with reference to the historical experience it reflects." *City of Boerne*, 521 U.S. at 525, 117 S.Ct. 2157 (alterations in original omitted). Thus, we must view the FMLA against the continuing impact of nearly two centuries of systemic state sex dis-

---

31. The Court in *Garrett* found the ADA beyond Congress' section 5 power in part because the Act prohibited state activity that disparately impacted the disabled. *See Garrett*, 121 S.Ct. at 967. The disparate impact in *Garrett* did not, however, as here, constitute the continuing effects of past intentional and unconstitutional state discrimination, a proper focus of Congress' remedial legislation as shown by the cases above.

crimination in employment and related laws. In light of this "historical experience," the FMLA congruently and proportionately remedies the contemporary impact of such constitutional violations.

First, the targeted FMLA provision here at issue focuses only on one type of policy of public and private employers, one that quite directly reflects the interaction between workplace and domestic duties at the core of the unconstitutional state legislation summarized above. The prior state legislation sought to police a gender-specific division of labor, separating the domestic, female sphere from the workplace, male realm. The limited FMLA protection of family care leave seeks to counteract that historical division in all the interrelated ways already discussed.

Moreover, although the history of unconstitutional state legislation recounted above was directed against the workplace participation of women, Congress had excellent reasons, noted in the statute's Findings and Purposes and in its legislative history, for choosing a gender-neutral solution to the problem of inequality in the workplace thus fostered. For one thing, the Constitution almost surely so requires. For another, the same gender stereotyping that underlay the legislation limiting women's workplace options also limited the options of men who wished to participate more fully in their family's domestic lives than traditionally had been the case. Third, protecting the leave rights of women only would have the perverse effect of both reinforcing the traditional stereotypes generally and, more specifically, fostering subtle discrimination against the hiring of women because of their protected right to leave. See § 2601(a)(6) ("employment standards that apply to one gender only have serious potential for encouraging employers to discriminate against employees and applicants for employment who are of

that gender"). So one more targeted option for remedying past state discrimination against women in employment—that of assuring family care leave for women alone—was simply not viable.

Additionally, the FMLA's intrusion into a state employer's policy options is narrow: The FMLA impacts only the states' public employee leave plans, and does so in a limited way. The statute addresses only the policies of larger employing entities. Further, the statute protects job security, not wage continuation. As such, the FMLA is *not* principally concerned with providing an economic benefit. Instead, the statute is directed at assuring the ability of women to participate in the workforce despite their still-greater role in caring for ill relatives, and of men to take on domestic responsibilities without foregoing their employment.

In addition, the FMLA does not require job security for the employer's most highly paid (top 10%) salaried employees if restoration would cause "substantial and grievous economic injury." § 2614(b). And the Act sidesteps the political arena by expressly excluding states' elected officials, their staffs, and appointed policy makers from its coverage. § 2611(3) (adopting the definition of "employee" used in the FLSA, 29 U.S.C. § 203(e)).

Finally, although the FMLA does not include a time limitation for its requirements, the Act did establish a Commission to study the impact of the legislation and to report to Congress concerning any appropriate statutory modifications, 29 U.S.C. §§ 2631, 2632, which the Commission did. Commission on Family and Medical Leave, *A Workable Balance: Report to Congress on Family and Medical Leave Policies* (1996).

Thus, as a remedy for the current impact of the long history of state-enforced discrimination against women in employ-

ment, the FMLA is appropriately classified with the Voting Rights Act, upheld in *South Carolina*, 383 U.S. at 315, 86 S.Ct. 803, and its progeny. Like that Act, the FMLA family leave provisions "affected a discrete class of state laws." In contrast, the "[s]weeping coverage" of the Religious Freedom Restoration Act, struck down in *City of Boerne*, 521 U.S. at 532, 117 S.Ct. 2157, intruded "at every level of government, displacing laws and prohibiting official actions of almost every description and regardless of subject matter." As well-targeted legislation designed to remedy the long history of state-supported treatment of women as marginal workers, the requirement that states in their own employment practices assure that the traditional stereotypes are no longer hampering women's workplace participation is a modest one indeed.

In short, by ensuring that an employee can attend to the most important of family duties but still retain his or her job (or its equivalent), the FMLA remedies to some extent the skewed labor market that had developed in reliance on state-sponsored gender roles. As such, the FMLA family care provisions respond in a congruent manner to a *specific* sort of pervasive unconstitutional state action, of the kind missing in the Supreme Court's recent Fourteenth Amendment section 5 cases. The statute also enacted modest provisions, proportional in their sweep to Congress' important goal of counteracting the impact of stereotypes regarding the family and workplace roles of men and women fostered by unconstitutional state legislation. For these reasons as well as those already discussed, we conclude that Congress acted within its authority under section 5 of the Fourteenth Amendment in enacting the family care provisions of the FMLA.

## B. *Ex Parte Young*

Even if Hibbs' suit against the Nevada Department of Human Resources were barred by the Eleventh Amendment, he might still be able to maintain his FMLA suit for prospective injunctive relief against Crawford and Firpo in their official capacities, under *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Hibbs' opening brief, liberally construed, raises this argument. Hibbs presented the argument to the district court, but the district court did not expressly address it. Defendants do not address the argument in their answering briefs.

■■■ Under *Ex parte Young*, private individuals can sue state officers in their official capacities to obtain prospective injunctive relief from the officers' violation of federal law. *See id.* at 159–60, 28 S.Ct. 441. Reinstatement is one of the remedies that Hibbs seeks, and reinstatement is the sort of prospective injunctive relief for which a state officer can be held liable. *Doe v. Lawrence Livermore Nat'l Lab.*, 131 F.3d 836, 839–42 (9th Cir.1997).

■■■ However, Hibbs can maintain his suit under the FMLA against Crawford and Firpo only if the FMLA gives him a right of action against them. The FMLA grants employees a right of action "against any employer" for violations of the act, 29 U.S.C. § 2617(a)(2), and Hibbs was employed by the Department of Human Resources, not by Crawford or Firpo. However, the statute defines "employer" as including "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." *Id.* § 2611(4)(A)(ii)(I). There is no Ninth Circuit case law on the issue of whether a supervisory employee of a state agency who is sued in her official capacity is an "employer" within the meaning of § 2611(4)(A)(ii)(I), but there is some relevant case law from other circuits. Those

cases indicate that whether a supervisory employee counts as an employer for purposes of the statute depends on a number of factors, such as the degree of authority and control over subordinates that the supervisor exercises. *See Wascura v. Carver*, 169 F.3d 683, 685–87 (11th Cir.1999) (discussing § 2611(4)(A)(ii)(I) and drawing on case law that interprets identical language in the FLSA); *Welch v. Laney*, 57 F.3d 1004, 1011 (11th Cir.1995) (interpreting the identical language in the FLSA); *Riordan v. Kempiners*, 831 F.2d 690, 694–95 (7th Cir.1987) (same). While we agree with the other circuits that some supervisory employees can be sued as employers under the FMLA, determining which supervisors qualify is not a straightforward matter, and it has not been briefed by the parties, despite an opportunity for supplemental briefing on the applicability of *Ex parte Young* to Hibbs's case. The parties have not, for example, cited to record evidence or presented arguments concerning the extent of Crawford's or Firpo's supervisory authority over Welfare Division employees in the position formerly held by Hibbs. *See Welch*, 57 F.3d at 1011.

■ We therefore cannot grant relief to Hibbs on the basis of his *Ex parte Young* argument, because he has failed to develop the record and his argument sufficiently to render it capable of assessment by this court. *Cf. United States v. Viramontes–Alvarado*, 149 F.3d 912, 916 n. 2 (9th Cir.1998) ("[S]ince this matter was not specifically and distinctly argued in [appellant's] opening brief we need not consider it.").[32]

## C. Procedural Due Process

Hibbs argues that his termination violated his procedural due process rights under the Fourteenth Amendment. He contends that because his employment with the Welfare Division was terminable only for cause, he had a property interest in the continuation of that employment. He then argues that he was deprived of that property without due process of law because: (1) The Welfare Division allegedly violated various federal regulations by not notifying him that his unpaid and paid leave ran concurrently; (2) He was fired in retaliation for questioning the Welfare Division's interpretation of the FMLA; and (3) He did not receive "proper notice and an opportunity to be heard" on his interpretation of the FMLA. Defendants do not dispute Hibbs' claim that his employment was terminable only for cause and that it is therefore a cognizable property interest, but they argue that he received all the process that was due to him under the Constitution.[33]

■ Hibbs' brief cites no evidence in support of his retaliation claim, so that claim cannot serve as a basis for reversal. Hibbs also fails to explain how a due process claim can be based on an allegation of a mere violation of federal regulations— the regulations might well provide for more process than the Constitution requires, and Hibbs has not argued that they do not. Consequently, Hibbs' only viable

---

32. Our declining to decide the merits of the *Ex Parte Young* issue is based on this record (or the lack of it) and is not meant to foreclose further development of the record on remand. *See Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 702 (9th Cir.1992).

33. Defendants also argue that Hibbs' substantive due process rights were not violated.

Hibbs' brief contains no arguments concerning substantive due process. Consequently, insofar as Hibbs presented a substantive due process claim to the district court, any arguments in support of that claim have now been waived. *Viramontes–Alvarado*, 149 F.3d at 916 n. 2.

due process claim is based on his allegation that he did not receive adequate pre-termination notice and an opportunity to be heard.

 Under *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), a public employee terminable only for cause is entitled to "notice and an opportunity to respond." *Id.* at 546, 105 S.Ct. 1487; *see also id.* ("The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."); *Gilbert v. Homar,* 520 U.S. 924, 929, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997) ("[A] public employee dismissable only for cause [is] entitled to a very limited hearing prior to his termination, to be followed by a more comprehensive post-termination hearing.").[34]

Hibbs received a written "Specificity of Charges" that documented and described in detail the charges against him, namely, his continued absence from work without leave and his refusal to comply with or respond to orders to return. The document also informed him that the recommended disciplinary action was dismissal, and it notified him of his already-scheduled predisciplinary hearing. According to the hearing officer's report, Hibbs appeared at the hearing, told his side of the story, and, when asked at the close of the hearing whether he had anything more to say, replied that he did not. Hibbs has not cited any evidence that contradicts the hearing officer's account.

Because they gave Hibbs clear notice and a full opportunity to be heard, the procedures followed by the Welfare Division amply satisfy the due process requirements spelled out in *Loudermill* and *Gilbert.* We therefore find no error in the district court's grant of summary judgment against Hibbs on his procedural due process claim.

## IV. CONCLUSION

The district court erred both in concluding that congressional intent to abrogate state sovereign immunity is not sufficiently clear and in holding that Congress did not validly exercise its section 5 power when it gave state employees the right to sue their employers for violations of § 2612(a)(1)(C). Accordingly, the district court's grant of Defendants' motion for summary judgment on the FMLA claim is reversed. Because the district court's dismissal of Hibbs' state-law claims was dependent on its dismissal of the federal claims, we vacate the dismissal of the state-law claims as well, and remand the case for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**

---

**34.** Hibbs' only argument regarding post-termination procedures consists of the following sentence: "The adequacy of the denial of the post hearing altogether based upon a tight time schedule and the circumstances of Appellant's requirement to attend to his spouse in a critical situation was never heard." To the extent that this amounts to an argument that the ten-working-day deadline for filing an appeal of his dismissal violated Hibbs' right to procedural due process, the argument is too undeveloped to be capable of assessment. Hibbs has not argued that the deadline is too short to be met; he has not even explained why he failed to meet it.